# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 4, 2026

Lyle W. Cayce
Clerk

No. 25-60450

Artur Torosyan,

*Petitioner*,

*versus*

Todd Wallace Blanche, *Acting U.S. Attorney General*,

*Respondent*.

Petition for Review of an Order of
the Board of Immigration Appeals
Agency No. A249 377 108

Before King, Smith, and Ramirez, *Circuit Judges*.

Per Curiam:[*]

Artur Torosyan, a native of Russia and citizen of Armenia, petitions for review of a decision of the Board of Immigration Appeals ("BIA") affirming the denial by the immigration judge ("I.J.") of his claims for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). For the following reasons, the petition is denied.

---

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 25-60450

## I.

## A.

On May 30, 2024, Torosyan applied for admission to the United States without a valid entry document. That same day, the Department of Homeland Security ("DHS") filed a notice to appear, charging him as removable. Torosyan conceded removability and subsequently applied for asylum, withholding of removal, and protection under the CAT.

Torosyan's requests for relief arise out of alleged political persecution by the Armenian government for his involvement in anti-government protests. On September 19, 2023, while Torosyan was on his honeymoon with his wife in Cyprus, Azerbaijan conducted a military operation to gain full control over Nagorno-Karabakh, resulting in the Armenian government's ceding control of the region. In response to what he characterized as the prime minister's "giving away the Karabakh," Torosyan claims that he and his wife decided to end their honeymoon early to return to Armenia and join the protests.

Torosyan reports returning to Armenia on September 29 and participating in a protest on September 30. He testified that during that protest, uniformed red-beret officers threw him to the ground and beat him for about twenty minutes, leaving him bruised and with a broken pinky finger. Torosyan states that he was then taken to Erebuni Medical Center and hospitalized for five days. Following his discharge from medical care, Torosyan returned to work, where he reports being confronted by a plainclothes police officer and warned to stop his political activity.

Several months later, Torosyan again participated in a protest against the prime minister's handling of border negotiations and was arrested and detained by Armenian police. He was held without charge for seventy-two hours, the maximum period permitted under Armenian law. He claims that

2

on his release, police threatened sexual assault with a baton if he returned.

Torosyan claims he continued his political activities and, in the weeks that followed, began preparing flyers with several friends for an upcoming protest organized by a local church leader. But on the morning of the protest, four masked police officers raided his home to confiscate the flyers. During the raid, he recounts being repeatedly slapped and kicked by an officer as an act of "ridicule" while the other officers searched the house for flyers. The officers then warned Torosyan that it was his "last chance" and left with a bag containing the flyers. Following that incident, Torosyan fled Armenia with his family.

## B.

At the hearing on Torosyan's application, the DHS counsel questioned him about several potential inconsistencies, omissions, and implausibilities in his account.

First, DHS counsel noted a discrepancy regarding which of Torosyan's pinky fingers was broken during the September 30 protest. Although Torosyan had testified that his right pinky finger was broken, the medical report identified his left pinky as the injured finger.[1] When confronted with the inconsistency, Torosyan reaffirmed his earlier testimony that only his right pinky finger had been broken but could not explain the discrepancy beyond suggesting a possible translation error.

Next, DHS counsel questioned Torosyan about Instagram photos his wife posted on October 6 and October 11 showing the couple in Cyprus, despite his claimed September 29 return to Armenia. Torosyan explained

---

[1] Further, the written statements from Torosyan's friends and the original written statement from his wife also suggested that his left pinky, not his right, was broken.

that although the photos were not posted on social media until October, they had been taken in September. Ms. Torosyan similarly testified that she often posts photos after the day they are taken. Further complicating the honeymoon timeline, although Torosyan testified that the couple intended to stay in Cyprus for a month, his wife suggested that the trip was intended to last only ten to fifteen days.

Later in the hearing, the I.J. questioned Torosyan about why, given his claimed level of political involvement, he was not affiliated with any political party or activist group. Torosyan responded that he views all of Armenia's political parties as controlled by Russia and would never join one. When asked how those protests could be organized without the support of a political party or activist group, Torosyan disclosed that the May 9 protest was led by a local church leader, a detail absent from both his asylum application and credible-fear interview.

## C.

Following the merits hearing, the I.J. found Torosyan not credible, relying on the above discrepancies, his "overly defensive" demeanor during the hearing, and the inherent implausibility of Torosyan's decision to cut his honeymoon short to engage in dangerous protests, given his lack of previous political activity. Because an adverse-credibility determination is dispositive of asylum and withholding-of-removal claims, the I.J. denied both applications.[2]

Regarding Torosyan's request for CAT protection, the I.J. separately considered his independent evidence—including various country-condition

---

[2] *See Arulnanthy v. Garland*, 17 F.4th 586, 597 (5th Cir. 2021) (asylum claim); *Dayo v. Holder*, 687 F.3d 653, 658–59 (5th Cir. 2012) (withholding claim).

reports for Armenia[3]—but concluded that the evidence was insufficient to, establish, independently, his CAT eligibility.  Although the reports reflected a level of general political unrest, the I.J. found that they did not establish a particularized likelihood that Torosyan himself would be tortured.  As a result, the I.J. denied CAT relief.

On appeal, the BIA affirmed the denial of asylum, withholding-of-removal, and CAT protection, finding no clear error in the adverse-credibility determination or CAT determination, and adopting the I.J.'s reasoning wholesale[4].  Torosyan timely filed a petition for review.

## II.
### A.

To prevail on an asylum claim, "an applicant must show [he] is a refugee by proving [he] suffered past persecution or has a well-founded fear of future persecution" on account of his race, religion, nationality, membership in a particular social group, or political opinion. *Rangel v. Garland*, 100 F.4th 599, 604 (5th Cir. 2024) (citation modified); 8 U.S.C. § 1101(a)-(42)(A).  To qualify for withholding of removal, an applicant must satisfy the higher standard of "demonstrat[ing] a clear probability of persecution upon return." *Munoz-Granados v. Barr*, 958 F.3d 402, 408 (5th Cir. 2020) (citation modified).

Generally speaking, an applicant cannot satisfy his burden of proof for

---

[3] The I.J. additionally considered witness statements from Torosyan's friends as well as the Erebuni medical center report; that evidence was afforded little weight, as the medical record contained discrepancies, and Torosyan's friends were not subject to cross-examination.

[4] The BIA affirmed the I.J.'s denial of asylum and withholding of removal solely on the basis of the adverse-credibility determination and did not reach the I.J.'s alternative findings.

asylum or withholding of removal where his testimony is not credible. *Ghotra v. Whitaker*, 912 F.3d 284, 289–90 (5th Cir. 2019). An I.J. determines an applicant's credibility by "considering the totality of the circumstances, and all relevant factors," including, inter alia, his "demeanor, candor, or responsiveness," "the inherent plausibility of [his] account," and "the consistency of [his] statements with other evidence of record." 8 U.S.C. § 1158(b)-(1)(B)(iii). An adverse-credibility determination must be "supported by specific and cogent reasons derived from the record." *Arulnanthy*, 17 F.4th at 597 (5th Cir. 2021) (citation modified).

On petition for review, we "review the BIA's decision and only consider the I.J.'s decision to the extent it influenced the BIA." *Shaikh v. Holder*, 588 F.3d 861, 863 (5th Cir. 2009). The BIA affirmed the I.J.'s adverse-credibility determination along with the I.J.'s reasoning. We therefore have "authority to review the IJ's decision as well as that of the BIA." *Singh v. Sessions,* 880 F.3d 220, 224 (5th Cir. 2018).

We review questions of law *de novo*. *Avelar-Oliva v. Barr*, 954 F.3d 757, 763 (5th Cir. 2020). We review the immigration court's "factual findings—such as credibility determinations, eligibility for asylum, withholding of removal, and relief under CAT—for substantial evidence." *Santos-Alvarado v. Barr*, 967 F.3d 428, 436 (5th Cir. 2020). Reversal is improper under that standard "unless we decide not only that the evidence supports a contrary conclusion, but also that the evidence *compels* it." *Id.* at 437.

## B.

Torosyan contests the adverse-credibility determination underlying the denial-of-asylum and withholding-of-removal relief by challenging each of the bases the I.J. and BIA relied on to find him not credible. He asserts that the I.J.'s demeanor finding and cited discrepancies cannot support the

adverse credibility finding under the totality of the circumstances. Additionally, Torosyan maintains that the I.J. erred by failing to afford him an adequate opportunity to explain the inconsistencies and by rejecting the explanations he offered.

We begin with Torosyan's claim that demeanor, standing alone, cannot serve as a reliable basis for finding him not credible. As an initial matter, neither the I.J. nor the BIA considered Torosyan's demeanor "standing alone." More importantly, I.J.s are explicitly permitted by statute to consider an applicant's "demeanor, candor, or responsiveness" in determining credibility. 8 U.S.C. § 1158(b)(1)(B)(iii). The I.J. found that Torosyan's defensiveness when questioned gave reason to find him not credible. We must give substantial deference to the I.J.'s assessment.[5] Torosyan's unsupported contention that demeanor is too subjective to provide a reliable basis for assessing credibility provides no basis, much less a compelling one, to disregard the I.J.'s finding.

As to the inconsistencies, Torosyan first posits that the discrepancies regarding which pinky finger was injured and whether his honeymoon was intended to last ten to fifteen days or a full month were too minor and innocuous to support the adverse-credibility finding. He further contends that his omission of the church leader's role in the May 9 protest was similarly immaterial.

As an initial matter, although two of our sister circuits have held that adverse-credibility determinations cannot be supported by inconsistencies or omissions that have no tendency to suggest fabrication,[6] we have not so held,

---

[5] *See Wang v. Holder*, 569 F.3d 531, 539 (5th Cir. 2009) (explaining that because appellate courts are not in a position to judge the applicant's demeanor, they must rely on the I.J.'s observations).

[6] *See Hong Fei Gao v. Sessions*, 891 F.3d 67, 77 (2d Cir. 2018) ("[a] trivial incon-

and regardless, Torosyan's inconsistences and omissions can be understood as suggesting fabrication. Further, Torosyan's emphasis on the significance of the inconsistencies and omissions is misguided. *See Avelar-Oliva*, 954 F.3d at 768. The I.J. and BIA "may rely on *any* inconsistency or omission in making an adverse credibility determination," regardless of whether it "go[es] to the heart of the applicant's claim." *Wang*, 569 F.3d at 538 (quoting § 1158(b)(1)(B)(iii)). So long as it is reflected in the record, "[e]ven minor inconsistencies . . . may form the basis of a negative credibility finding."[7]

The inconsistencies and omissions identified by the I.J. and BIA are plainly reflected in the record. Torosyan testified that his right pinky was broken, but the medical report and witness statements he submitted instead indicated that his left pinky was broken; Torosyan testified that the honeymoon was intended to last a month, but his wife suggested that it was only intended to last ten to fifteen days; and Torosyan mentioned the church leader's role at the merits hearing but not in his asylum application or credible-fear interview. Accordingly, the I.J. and BIA did not err in considering those inconsistencies and omissions as part of the adverse-credibility determination.

Torosyan claims that the I.J. failed to inform him of the concerns raised by the identified inconsistencies and failed to give him an opportunity

---

sistency or omission that has no tendency to suggest a petitioner fabricated his or her claim will not support an adverse credibility determination"); *see also Iman v. Barr*, 972 F.3d 1058, 1069 (9th Cir. 2020) ("the IJ and the BIA erred by relying on an omission that has no tendency to show [petitioner] fabricated his claims of persecution when considered in light of the totality of the circumstances").

[7] *Singh v. Garland,* 20 F.4th 1049, 1053 (5th Cir. 2021); *see also Nkenglefac v. Garland,* 34 F.4th 422, 430 (5th Cir. 2022) (holding that inconsistencies not grounded in the record cannot support an adverse credibility determination).

to respond with additional testimony and evidence. Torosyan contends that the I.J. was specifically required to question him about the medical-record discrepancy and the timing of the honeymoon photos. But no such requirement exists where the "applicant was aware of [the inconsistency] and had an opportunity to offer an explanation."[8] DHS counsel's questioning put Torosyan on notice of these inconsistencies and provided him with sufficient opportunity to offer his explanations.[9]

Finally, Torosyan claims that the I.J. and BIA erred in rejecting his explanations for the discrepancies. Before the I.J. and on appeal, he contended that the medical-record discrepancy may have resulted from a mistranslation, that his wife's differing recollection of the honeymoon's intended length was plausible given its abrupt end, and that, although the Instagram photos showing him in Cyprus were posted in October, they were taken in late September.[10]

Even assuming Torosyan's explanations were plausible,[11] "[n]either an I.J. nor the BIA is required to accept a petitioner's explanation for the plain inconsistencies in [his] story." *Morales v. Sessions*, 860 F.3d 812, 817 (5th Cir. 2017) (citation modified). It is possible that the photos taken of Torosyan in Cyprus were taken in September and posted in October after he

---

[8] *Mpesse v. Garland*, No. 20-61207, 2021 WL 4256177, at *5 (5th Cir. 2021) (per curiam) (unpublished) (quoting *Matter of Y-I-M-*, 27 I. & N. Dec. 724, 728 (BIA 2019)).

[9] *Id.* ("[w]hile the IJ may ask about the inconsistency, the Government may give the applicant an opportunity to respond through cross-examination.") (citation modified)).

[10] Apart from the medical report that was inconsistent with Torosyan's testimony, the record contains no evidence that could corroborate these explanations, such as passport stamps, flight records, or other documents showing that Torosyan returned to Armenia in time for the September 30 protest.

[11] The I.J. found the mistranslation explanation implausible, given that the discrepancy was repeated "in more than one document and by different individuals."

returned to Armenia. It is plausible that Torosyan remained in Cyprus into early October, as he had originally intended. The I.J. and BIA did not err by adopting the latter interpretation.[12] Consequently, the I.J. did not err in considering these inconsistencies in his credibility determination.

Having upheld each basis relied on by the I.J. and BIA to find Torosyan not credible, we must affirm the credibility determination unless Torosyan's corroborating evidence not only supports, but compels, a contrary credibility finding.[13] But Torosyan's corroborating evidence supplied the very "inconsistencies that the BIA found so troubling." *See Ghotra*, 912 F.3d at 290. Therefore, his evidence is not so compelling that "'no reasonable factfinder' could find the applicant's testimony incredible." *Id.* at 288. The adverse-credibility determination is affirmed.

Because the adverse-credibility finding is dispositive of both asylum and withholding-of-removal claims,[14] the BIA did not err in affirming the I.J.'s denial of relief.

## III.

CAT claims are distinct from asylum and withholding-of-removal claims and require "separate analytical attention." *Santos-Alvarado*, 967 F.3d at 436 (citation modified). To obtain CAT protection, the applicant

---

[12] *See Morales-Morales v. Barr*, 933 F.3d 456, 463 (5th Cir. 2019) ("Where there are two permissible views of the evidence, the [I.J.'s] choice between them cannot be clearly erroneous").

[13] *See Santos-Alvarado*, 967 F.3d at 437*; see also Cardona-Franco v. Garland*, 35 F.4th 359, 364 (5th Cir. 2022) (upholding the I.J.'s credibility determination "even where the court doubt[ed] the propriety of some of the credibility findings") (citation modified)).

[14] *See Arulnanthy,* 17 F.4th at 597 (asylum claims); *see also Rubio v. Bondi*, 147 F.4th 568, 581 (5th Cir. 2025) (an applicant that fails to meet the bar for asylum also does not meet the standard for withholding of removal).

bears the burden of establishing that if removed, "it is more likely than not that [he] would be tortured by, or with the acquiescence of, government officials acting under the color of law." *L.N. v. Garland*, 109 F.4th 389, 394 (5th Cir. 2024). In assessing likelihood of torture, the regulations implementing the CAT require the I.J. to consider "all evidence relevant to the possibility of future torture," including "evidence of past torture inflicted upon the applicant" and "relevant information regarding conditions in the country of removal." 8 C.F.R. § 1208.16(c)(3).

Because substantial evidence supports the I.J.'s adverse-credibility findings, Torosyan cannot rely on his testimony as evidence of past or future torture.[15] Instead, he must rely on his independent, nontestimonial evidence to establish his entitlement to CAT relief. *Arulnanthy,* 17 F.4th at 597–98.

Still, Torosyan suggests that his objective evidence compels a conclusion that he faces a serious risk of future torture and that the BIA erred by over-relying on the adverse-credibility finding and by failing to consider country-conditions evidence. But the record belies Torosyan's claim that the BIA did not consider the country-conditions evidence.

The I.J. engaged directly with the country-conditions reports, recognizing that they described general political unrest and ongoing protests similar to what Torosyan testified to. The I.J. also considered country-conditions evidence that undercut Torosyan's claimed likelihood of torture, including the State Department's report that Armenia has no political prisoners. Moreover, the I.J. determined that the reports did little to show that Torosyan specifically was likely to be tortured.[16] The I.J.'s specific discussion of

---

[15] Consequently, we need not address Torosyan's assertion that, if credited, his prior interactions with the Armenian police necessarily amount to past torture.

[16] *See Qorane v. Barr*, 919 F.3d 904, 911 (5th Cir. 2019) ("Generalized country

this evidence, which the BIA adopted in full, easily overcomes any concern "that the BIA did not adequately consider the evidence before it."[17]

Torosyan's adjacent contention that the BIA ignored the weight of the record amounts to a mere "disagreement with how the IJ weighed competing evidence" and does not constitute reviewable error. *Suate-Orellana v. Barr*, 979 F.3d 1056, 1064 n.6 (5th Cir. 2020).

Because Torosyan points to no other objective evidence in support of his CAT entitlement,[18] he has not met his burden of demonstrating that the evidence compels a conclusion contrary to the I.J. Consequently, the denial of CAT protection is affirmed.

The petition for review is DENIED.

_____

evidence tells us little about the likelihood state actors will torture any particular person.").

[17] *Ndifon v. Garland*, 49 F.4th 986, 990 (5th Cir. 2022); *see also Melendez-Monge v. Garland*, No. 20-60814, 2022 WL 1532641, at *2 (5th Cir. 2022) (per curiam) (unpublished) (reasoning that an I.J.'s general statement that she had considered the country-conditions evidence was sufficient to show adequate consideration by the BIA).

[18] Torosyan seemingly appeals to his status as a "known political dissenter" to establish his particularized risk, but that relies on his discredited testimony and is entitled to little weight.